ROCKOWITZ CORSET AND BRASSIERE CORPORATION, Respondent, *v.* MADAME X COMPANY, INC., and Others, Appellants, Impleaded with JOSEPH A. WEIL, Defendant.

First Department, January 13, 1928.

Trade-marks and trade names — unfair competition — action to restrain defendant from use of trade name " Madame X " and for accounting — trade-mark was registered in 1911 and 1912 by individual, plaintiff's predecessor — trade-mark was not used extensively by plaintiff's predecessor and for more than eight years was not used at all — defendants had no knowledge of existence of trade-mark — defendants' product is not similar to plaintiff's — plaintiff is not entitled to injunction.

Plaintiff brings this action to restrain the defendants from using the trade-mark " Madame X " and for an accounting. The trade-mark was registered by plaintiff's predecessor in 1911 and 1912 and was used to a small extent until about 1916 and thereafter for about eight years it was not used by plaintiff's predecessor. Defendants adopted the trade-mark " Madame X " without knowledge that it had ever been used by another or was registered, and by extensive advertising have made it valuable in their business of manufacturing corset girdles. There is no similarity between the corsets originally manufactured by plaintiff's predecessor and the girdles manufactured by defendants. Plaintiff corporation was organized in 1924 and has no extensive clientele. The testimony to support plaintiff's contention is false in nearly every instance.

Under all the circumstances of the case, it cannot be said that the defendants have violated the trade-mark or that the plaintiff is entitled to an injunction restraining its use.

The contention by the plaintiff that the trade-mark was revived after being abandoned for eight years is not supported by the evidence.

Furthermore, it appears that there was no fraud or wrongdoing on the part of the defendants, and that the profits made by them were not due to any value

in the name but rather to the novelty of the article sold and the large expenditures made in advertising and that any other name would have been as effective as the trade-mark " Madame X."

APPEAL by the defendants, Madame X Company, Inc., and others, from an interlocutory judgment of the Supreme Court, entered in the office of the clerk of the county of New York on the 31st day of December, 1925.

*Neil P. Cullom* of counsel [*James E. Freehill* and *Richard B. Cavanagh* with him on the brief; *Neil P. Cullom*, attorney], for the appellants Madame X Company, Inc., Thompson-Barlow Co., Inc., Ralph S. Thompson, Wilbur B. Ruthrauff and Frederick B. Ryan.

*Maxwell Slade* of counsel [*David H. Slade* with him on the brief; *Slade & Slade*, attorneys], for the appellants Weil Corset Company and Samuel J. Weil.

*Frank C. Laughlin* of counsel [*Ellis W. Leavenworth* and *W. Davis Conrad* with him on the brief; *Carson & Conrad*, attorneys], for the respondent.

MARTIN, J.  The plaintiff, at Special Term, was granted an interlocutory judgment restraining the defendants from using the trade name and trade-mark " Madame X " and requiring them to account for profits.

In 1911 and 1912 Abe Rockowitz, plaintiff's predecessor, registered the trade-mark, his concern having commenced business in 1911. It was adjudicated a bankrupt in October, 1914, and the business and tangible assets were sold.

. Subsequently there occurred transfers of the trade-marks and good will on which plaintiff relies, the last one having been made directly to plaintiff in November, 1924. The business was never resumed after June, 1916, and defendants point to the absence of actual, continued and legitimate use of the trade-mark, asserting that it was abandoned, and that the attempted assignment eight and a half years after the sale of the tangible assets of the bankrupt was merely a part of a scheme to appropriate to plaintiff the business which had meanwhile been built up by the defendants.

The plaintiff's predecessors took no action toward reviving the old bankrupt business until two years after defendant had innocently and without knowledge of the previous use of the mark by plaintiff adopted it and established a most extensive worldwide business, in connection with which millions of dollars were spent in advertising the trade-mark " Madame X " in the sale of their own merchandise.

There is no evidence of similarity between the defendants' mer-

chandise, consisting principally of Madame X corsets, and the old style corset manufactured by Rockowitz. His was constructed of steel and fabric. Defendants' was a rubber garment, the success of which was due to an entirely new idea in connection with corsets, to which reference will be made later. The plaintiff was incorporated in November, 1924, and apparently had no substantial clientele or following in the trade, but even if it did, there could be no confusion by prospective purchasers of corsets as to the merchandise sold.

In November, 1922, the defendants commenced manufacturing corsets and girdles known as the " Madame X Reducing Girdle." There was acquiescence in said use and no objection thereto until the institution of this suit in January, 1925, by which time the idea of a reducing corset had become popular and defendants' business had grown to huge proportions.

The defendants assert that the plaintiff is a dummy organized for the sole purpose of maintaining this action, and that the litigation is merely a speculation toward unlawfully exacting money from the defendants.

The plaintiff alleges that large sums of money have been expended in advertising, but in the bill of particulars it is unable to state even approximately the amount of the " substantial sums " expended by it and its predecessors in the advertising referred to in the complaint.

The plaintiff's case must stand or fall on the testimony of Joe and Abe Rocke or Rockowitz. Joe Rockowitz was forced to admit that for practically fifteen years his occupation has been that of a taxicab chauffeur; and the attempt to show that the original business was very profitable was a complete failure in the light of the bankruptcy in 1914. It appears that Joe Rocke became interested in the corset business after the bankruptcy sale. His connection therewith seems to have terminated in September, 1915, when he instituted an action in a fictitious name against his brother with the result that a receiver was appointed. His concern was the S. O. S. Corset Company. Though it is said to have had many agents, he was unable to tell the name of any of them. It is his contention that there never was any abandonment of the trade name or mark, but rather an intention to resume the corset business when the litigation was settled.

Nevertheless, his employment appears to have continued as taxicab driver, although he says he was in the real estate business. He testified that he received from plaintiff corporation $15,000 for the assignment of his alleged rights to the trade-mark, but on cross-examination he was unable to remember whether he received

$10,000 or $8,000, and finally he thought it was at least $5,000, which he says he lost in betting on the race horses. He did not place any of the money in a bank, nor did he ever have a bank account. Though he claimed to have been given all of the preferred stock of the plaintiff corporation, he was in receipt of $50 a day for attending at court as a witness, having received $300 up to that time. He knew nothing about the structure of a corset and rarely appeared in the place of business of the S. O. S. Corset Company, although he was supposed to be its shipping clerk.

His brother, Abe Rockowitz, the other witness upon whom the plaintiff must principally rely, he referred to as a " cheat," who had done his best to deceive him and take the business away from him, it being claimed that the title to the S. O. S. Corset Company was allowed to go into the name of Abe Rockowitz solely for the purpose of avoiding creditors and escaping the payment of judgments entered or expected in a number of outstanding suits; and on cross-examination there was produced an affidavit in which he avers: " I furnished the moneys for the purchase of that patent and to establish the business in the City of New York, and obtained the receipts which are the evidence of such purchase in the name of Abraham Rocke by his advice as a matter of precaution to avoid seizure and sale of the property upon claims then in litigation against me but without any intent on my part to defraud my creditors."

In so far as material, the testimony of this witness was shown to be false in nearly every instance.

Abe Rockowitz testified to events which occurred during the period from 1911 to 1916. He referred to the business as prosperous and as having a number of agents and employees, but was unable to name any of the agents or employees. He claims to have used the name " Madame X " in relation to hose supporters and later in relation to corsets, the latter from about 1912 to September, 1914, when the involuntary petition in bankruptcy was filed followed by an adjudication in bankruptcy. The reasons given by him for the bankruptcy were not supported by the facts.

At a sale the receiver in bankruptcy sold " Parcel F," including a patent, as well as all right, title and interest, if any, of the bankrupt and the receiver to the trade-mark and trade name, and a lawyer named Dorfman was the successful bidder for same. A controversy arose as to whom Dorfman represented. Abe and Joe Rockowitz each claimed to have provided the purchase money for the good will and trade name of Madame X Manufacturing Co., Inc., as appears from an order made after a referee in bankruptcy had taken testimony as to what had been paid by Dorfman.

In January, 1915, Abe Rockowitz filed a certificate which stated

he was the owner and proprietor of the business known as the S. O. S. Corset Company; and it appears that the business continued in a more or less desultory manner until the trial of the action between the brothers, referred to above, and known as the Gritz suit, in June, 1916, when it was adjudicated that Joe Rockowitz had title to the business, it being decreed: " That the defendant, Abraham Rocke has by fraud and in breach of trust secured apparent, nominal title and ownership of the property herein described and the business of the S. O. S. Corset Company from the defendant Joseph Rockowitz."

It was further adjudged that the business certificate filed by Abe Rockowitz in January, 1915, should be canceled  and that Abe should be restrained and " forever barred from asserting or claiming any estate, title or interest in and to the property   *   *   * of S. O. S. Corset Company."

In December, 1916, Abe Rockowitz was found guilty of contempt in that he had fraudulently concealed and refused to turn over one of the trade-marks.   The receiver appointed by the court " closed down the business " and sold all the tangible assets at public auction for $226.53, the assets of a business which the Rockowitz brothers say was very prosperous.

It is conceded that from June, 1916, to November 29, 1924, a period of over eight years, neither plaintiff nor any of its predecessors in interest at any time manufactured or sold any corsets or other garments under the trade-mark " Madame X."

It is also important to note that the Rockowitz brothers were contradicted not only by witnesses but by documentary proof on almost every material point.   Their estimate of each other is not flattering.   In their litigation they charged each other with dishonesty, each one taking oath as to ownership of the S. O. S. Corset Company, and each claiming to have paid the purchase money to Dorfman, who was not put on the stand by plaintiff.

On the testimony of these two brothers the plaintiff sought to establish the allegations of the complaint.   Whatever may be said as to whether the defendants, especially the defendant Weil, innocently used the name " Madame X," nevertheless it appears that the use of the name by either or both of the Rockowitz brothers was abandoned.

The defendants established their defense by several witnesses whose testimony was supported in many respects by documentary proof.   The defendant Ralph S. Thompson testified that he had been an officer of the Thompson-Barlow Company since its organization in 1918; that it had been in the mail order business and had built up a list of hundreds of thousands of names of women to

whom it had sold books and courses on diet and weight control; that prior to November, 1922, the Thompson-Barlow Company had been engaged in selling a rubber belt for men; that it was extensively advertised, the advertising apparently being directed to men; that nevertheless about thirty-five per cent of the answers received were from women, which led to the idea that there would be a demand for a reducing girdle for women, with the result that Thompson designed and made a girdle for women's use.  He produced the original girdle made of rubber with cloth re-enforcement, laced in the back as the men's belt had been laced, and with no garters.

At first the article was sold through the mails.  Then it was suggested that a society woman be found who would sponsor this new garment.  A mail order circular was prepared featuring a smart woman in evening attire, using a mask, and described as a " New York Society Woman."  This circular was produced and offered in evidence.  It contained the legend which in 1924 became the selling slogan of the Madame X corset: " Look thin while getting thin."

Omitting in the pressure of business to obtain the indorsement of a society woman, defendants decided to create a mythical character which would typify a condition they knew to be true, namely, that there were a great many society women who were fat and wanted to be thin.

An advertising expert suggested that a mask be put upon the figure and that she be referred to as " Madame X."  Thompson testified that up to the time of the adoption of the name " Madame X " in 1922, he had never heard of any company bearing the name " Madame X Manufacturing Co., Inc.," or any similar name or of Abe or Joe Rockowitz, or the receiver or S. O. S. Corset Company, Inc., and that he had never up to the time of the trial known any of the parties.

In the summer of 1923 defendants began experimenting with a more modern and more attractive corset, inasmuch as they had had a great many letters from women customers who had bought the girdle, asking " if we could not put garters on them; asking us if we could not lengthen them, so as to come down over the hips, and making several other similar suggestions."

About June, 1923, the Weil Corset Company was asked to embody these various changes and improvements in the corset, with the result that in the latter part of 1923 a number of sample rubber corsets, as distinguished from girdles or bands for the abdomen, had been prepared.  After four or five months' experimenting with this new article, advertising commenced.

The first newspaper or magazine advertising occurred in January, 1924. The sales in January, 1924, were $7,487.45; in February, $57,224.90; in March, $216,285.15; in April, $458,283.29; in May, $643,999.54; in June, $519,165.11; in July, $395,312.18; in August, $425,406.12; in September, $412,873.19; in October, $502,131.04; in November, $243,002.71, and in December, $129,859.03. In the United States alone in 1924 the sales amounted to $4,011,029.71.

During the year 1924 the defendants expended in direct advertising through newspapers and magazines $491,728.18 and in addition thereto $500,000 for demonstrations, traveling models, window and counter displays, circularizing, dealers' helps of one kind or another, mechanical dolls imported from France, and for various other special sales appeals.

The defendants' Madame X reducing girdle was sold in every State in the United States, in about 4,000 department stores and specialty shops. Defendants also established branch offices for the sales of their garment in London and Paris, extending their trade to practically every foreign country, including France, Great Britain, Norway, Sweden, Canada, Holland, Cuba, Mexico, Belgium and South America.

Experimentation continued and a garment more appealing to the feminine taste was evolved. As a sample of that result a pink all-rubber corset was produced at the trial. The trade-mark Madame X Reducing Girdle was stamped in the rubber by the manufacturer The Seamless Rubber Company. The corset achieved instantaneous success and was the best seller in 1924.

The witness testified " so far as I know, it was the first corset that had been made wholly of rubber. * * * There had been no attempt to substitute, in place of the fabric corset, an all-rubber garment." The defendants' new product performed the functions of a corset — it had garters, it came down over the hips, laced in the back or clasped in the front as preferred. It also had the reducing feature, on the basis of which it made a wide and successful appeal. Comfort and style were also emphasized.

Up to the second quarter of 1924, sales were made solely through the mails. Thereafter the article was placed in shops located in New Haven and Baltimore. Beginning in March, 1924, and for the period of a month Best & Company in New York had the exclusive sales agency in New York city. The sales increased as indicated by the figures above.

In January, 1924, upon defendants making an inquiry through a Washington patent attorney, they were advised that the trademark " Madame X " was available; that there was no conflict; and they did not know that the name had ever been previously

used in the same connection. In March, 1924, they heard for the first time of its previous use and in April, 1924, were advised by the Patent Office of the registration by Abraham Rockowitz, that same office having advised them in a previous month that "A search of the Office records in Class 39, Clothing, shows that no trade-mark like applicant's has been registered for use on the same kind of goods."

William A. Marble, a corset manufacturer and dealer in corsets over a period of fifty-one years, and president of the R. & G. Corset Co., Inc., testified that he had no interest whatever in the litigation; that the Madame X reducing girdle was recognized in the trade generally as a product of defendant Madame X Company, Inc.; that he had heard many years previously of the use of the name Madame X by others but never saw or heard of any advertising of the name prior to 1922. He said that prior to the adoption of the name by the defendants the trade-mark " Madame X " implied no good will whatever.

Another witness who had been in the corset business for forty years prior to his retirement in 1923, testified that the Madame X reducing girdle was identified in the trade as a product of the defendant Madame X Company, Inc., and that he had never heard of a Madame X corset prior to the adoption of the name by defendants.

Frederick B. Ryan, one of defendants, testified that there was nothing to put them on knowledge of the previous use of the name; and that any other name would have served defendants' purpose as well; that the name " Madame " was very commonly used in reference to corsets, and that the garment was quickly copied by numerous competitors throughout the country.

The questions of law involved are not difficult. The essence of the alleged wrong lies " in the sale of the property of one manufacturer or vendor for that of another." (*Pulitzer Publishing Co.* v. *Houston Printing Co.*, 4 F. [2d] 924.) This could not have happened here, for the plaintiff never had any corset business.

We are also convinced that the plaintiff has not brought the action in good faith and that the alleged transfer of title to it was for the purpose of this litigation, its predecessors having abandoned for more than eight years the use of the trade name or mark. The evidence clearly established that it had no value until defendant made it valuable by building up its business through extensive advertising. The sale of the assets of the old concern, belonging to one or both of the Rockowitz brothers, for $226.53 indicates to some extent the volume of their business and its value. We are also of the opinion that plaintiff failed to prove ownership of the trade-mark.

The record fails to disclose whether Dorfman received a formal transfer of the title of the Madame X trade-mark. That would account for the fact that the record also fails to show that there was a formal transfer from Dorfman to either of the Rockowitz brothers or to plaintiff.

Recognizing this the plaintiff contends that in any event there was a revival of the use of the Madame X trade-mark by Rockowitz brothers after the bankruptcy proceeding, and that even though there was a failure to show a transfer of title, this revival of the use of the trade-mark would be sufficient to sustain the action..

The extent of the alleged reviving and use of this trade-mark is shown in the affidavit made by Rockowitz which he admitted he verified, in which he said: " In said Segal's affidavit he seeks to charge deponent with failure to turn over earnings and profits of the business, and in answer thereto deponent states that the business has always been run at a loss, and that the co-defendants, Finver Brothers, have continually financed the business on behalf of deponent, and that there were no profits or net earnings of any kind during the course of the entire business, as will appear from the books of the business, now presumably in the hands of the receiver, and as a matter of fact deponent has constantly borrowed money from relatives and friends in order to meet the current needs of the business, such as bills and salaries and other incidental obligations that the business required, and as a matter of fact the business was so unprofitable — at no time carrying surplus profits or earnings — that deponent was barely able to draw sufficient to sustain himself and his family."

In addition, no fraud or wrongdoing or unfair competition was established, and no ground for an accounting shown. The profits made by the defendants were not due to any value in the name, but rather to the novelty of the article sold and the large expenditures made by defendants for advertising.

The plaintiff having failed to establish any ground for the relief granted, the interlocutory judgment should be reversed and a new trial ordered, with costs to the appellants to abide the event.

DOWLING, P. J., MERRELL, O'MALLEY and PROSKAUER, JJ., concur.

Judgment reversed and new trial ordered, with costs to the appellants to abide the event. Settle order on notice.